IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

TRINA JOHNSON,

        Plaintiff,

v.                                                                                                      Case No.  24-2056-JWB

JOHNSON COUNTY
BOARD OF COMMISIONERS,

        Defendant.

**MEMORANDUM ORDER**

This matter is before the court on Defendant's motion for summary judgment.  (Doc. 59.)  The motion is fully briefed and ripe for decision.  (Docs. 63, 67, 77.)  After carefully reviewing the record, Defendant's motion for summary judgment is granted for the reasons stated herein.

**I.  Facts**

Plaintiff brings three Title VII claims on the basis of race: Defendant (1) discriminated against her, (2) engaged in retaliation, and (3) created a hostile work environment.  (Doc. 54 at 24–33.)  Defendant moved for summary judgment on all three of Plaintiff's claims.  (Doc. 59.)  The following facts are material to the issues and uncontroverted.

Plaintiff works for Defendant as a Security and Investigations Specialist in its Department of Corrections ("DOC").  Her job responsibilities include investigating complaints of harassment, discrimination, and staff misconduct.  The Director of the DOC is Robert Sullivan.  Plaintiff has been reporting to him since October 2018.  There is also a human resources partner assigned to the DOC.  Beginning in February 2017, Shala Bloomberg became the human resources partner assigned to the DOC.  (Doc. 63 at 4–5; Doc. 70 at 7–6, 9, 51; Doc. 77 at 12.)

The origins of Plaintiff's claims stem from an incident with Shannon King. Shannon King worked for Defendant as a Senior Case Manager in the Adult Services Division for the DOC. In February 2021, an employee reported that King had become enraged, slammed her keyboard with her fists, and cursed at a coworker. Sullivan decided to have Plaintiff investigate the report against King. Sullivan told Plaintiff to focus on the incident. When Plaintiff interviewed the employee who complained of King's behavior, she learned that King was upset over a hiring decision. The hiring decision involved a black candidate who King believed had been passed over for a white candidate. Plaintiff then started investigating King's allegation that the hiring panel discriminated against the black candidate. (Doc. 63 at 7–8; Doc. 70 at 11–13)

Plaintiff told Sullivan that King admitted to the outburst. However, Plaintiff also informed Sullivan that King believed the hiring panel discriminated against a black candidate, and that King's evidence of this discrimination was the hiring panel's use of alleged discriminatory statements. Plaintiff then started to dig further into the alleged discriminatory hiring: emailing Bloomberg to request copies of the hiring panel's interview notes and conducting interviews with the panel. She even contacted an outside reference for the non-diverse candidate. (Doc. 63 at 9–10; Doc. 70 at 14–16.)

When Plaintiff finished her investigation into King, she told Bloomberg who she had interviewed and her conclusions. Bloomberg was shocked by Plaintiff's conduct and the scope of her investigation. Bloomberg informed her supervisor, Tiffany Hentschel, what Plaintiff had done during the investigation. Hentschel had questions concerning Plaintiff's behavior and told Bloomberg to inform Plaintiff to stop investigating the hiring decision. (Doc. 63 at 10–11; Doc. 70 at 17–18.)

Plaintiff also informed Sullivan that she had enough information to substantiate that there had been unlawful discrimination during the hiring process. In response, Sullivan emailed Plaintiff, wherein he explained that Plaintiff had expanded the investigation beyond its original scope and that per human resources policy, human resources and the legal department would now investigate the hiring discrimination claim. Defendant hired outside legal counsel to investigate the hiring decision. The outside counsel could not substantiate Plaintiff's claim that there was unlawful discrimination in the hiring decision. (Doc. 63 at 11–13; Doc. 70 at 18–20.)

Bloomberg rotated out of the DOC in June 2022. Corinne Espinoza replaced her as the human resources partner for the DOC. Espinoza informed Plaintiff in July 2022 that she would be responsible for all employee investigations and would attend all interviews that Plaintiff conducts. (Doc. 63 at 14; Doc. 70 at 22.)

When Plaintiff was informed of this, Plaintiff started to question her role and suspected that her job description and responsibilities were changing. By September 12, 2022, Plaintiff was not permitted to conduct EEO investigations. However, she acknowledges that she was still conducting investigations. For instance, she investigated alleged misconduct by correctional advisors in June 2022, January 2023, May 2023, and July 2023. And in March 2024, Plaintiff assisted a separate DOC employee with investigating a correctional advisor's misconduct. (Doc. 63 at 14–16; Doc. 70 at 22–25.)

In early 2023, Espinoza started to be concerned about Plaintiff's participation in employee misconduct interviews. She was also concerned that Plaintiff would continue to conduct EEO investigations without informing human resources. Because of Espinoza's concerns, Sullivan

started to consider changing Plaintiff's job description by removing the reference to employee investigations.[1] (Doc. 63 at 16–17; Doc. 70 at 26–27.)

It appears that the decision to possibly change Plaintiff's job description and responsibilities caused some confusion. The following incident illustrates the confusion. In February 2023, Espinoza requested Plaintiff's help with investigating an allegation of undue familiarity against a correctional advisor. Espinoza emailed Plaintiff to see if she would begin the investigation by meeting with the parties involved. Plaintiff then emailed Sullivan, informing him that it was unclear what was expected of her during the investigation. She told Sullivan that she believed human resources would be conducting investigations into allegations of discrimination and sexual harassment cases. Sullivan responded to Plaintiff by clarifying that there were elements of the investigation that would be reserved for human resources. Although the facts do not explicitly state this, it appears Plaintiff was confused as to whether she should be conducting or assisting with these types of investigations. (Doc. 63 at 18; Doc. 70 at 29–30.)

Espinoza and Plaintiff also struggled to work with one another. On February 14, 2023, Plaintiff and Espinoza had a conversation over the phone, during which Espinoza informed Plaintiff that Sullivan would be changing Plaintiff's job description, and that Plaintiff would no longer be conducting staff investigations. Plaintiff asked Espinoza if this change would cause a salary decrease; to which Espinoza responded that it was a possibility. After this conversation, Plaintiff sent an email to Sullivan, Hentschel, and Espinoza informing them that Espinoza would now be responsible for the investigations involving staff relations. Espinoza responded to Plaintiff's email, claiming to have not provided information about how investigations would be

---

[1] Plaintiff attempts to controvert the fact that Sullivan considered changing Plaintiff's job description after learning about Espinoza's concerns. However, she merely disagrees with Defendant's recitation of this fact. Indeed, she fails to put forth evidence that actually controverts Defendant's factual assertion that Sullivan began to consider changing Plaintiff's job description and responsibilities when he learned of these issues.

handled in the future. Plaintiff forwarded Espinoza's email to Sullivan. She asserted that Espinoza was lying and inquired about how to file a complaint against Espinoza. Plaintiff then filed a formal complaint against Espinoza, claiming that she was lying. (Doc. 63 at 19–20; Doc. 70 at 31–32.)

Denise Howard, an assistant county counselor, conducted the investigation into Plaintiff's complaint against Espinoza. Howard investigated whether Espinoza had lied to Plaintiff. On March 3, 2023, Howard emailed Plaintiff and informed her that she could not substantiate the complaint. Howard also told Plaintiff that she had informed Sullivan and human resources leadership that Plaintiff was concerned about her job responsibilities. (Doc. 63 at 20, 22; Doc. 70 at 32, 35.)

Sullivan then set a meeting with Plaintiff for March 24, 2023, to discuss her job description and responsibilities. During this meeting, Sullivan laid out multiple scenarios about how investigations would be handled. It is uncontroverted that under the scenarios laid out by Sullivan, human resources would be more involved in investigations than it had been before. (Doc. 63 at 22; Doc. 70 at 35–36.)

On March 31, 2023, Plaintiff sent an email to Sullivan and Keith Clark,[2] claiming that Sullivan was changing the manner in which investigations were assigned because of Plaintiff's conclusion that there had been racial discrimination in the hiring decision from two years prior. Defendant hired Kate Wright, an attorney with no connection to Defendant, to investigate Plaintiff's complaint that Sullivan was changing the way he assigns investigations because of Plaintiff's conclusion about the hiring decision. Wright concluded that Defendant was not discriminating or retaliating against Plaintiff by altering the way in which investigations were being assigned. (Doc. 63 at 23–24; Doc. 70 at 36–38.)

---

[2] The parties do not provide much information on Keith Clark. Based on the briefings, he was King's direct supervisor. (Doc. 63 at 7.)

Moreover, Sullivan transferred Espinoza to a different department after Plaintiff claimed she had lied. (Doc. 63 at 23; Doc. 70 at 37.)

There were three additional incidents described in the facts that Plaintiff took issue with.

First, Plaintiff was removed as an instructor for the annual in-service meeting. Yvonne Springer is the Staff Development Manager for the DOC. Springer created the agenda for the annual in-service training. She learned that Plaintiff's past presentations on the proper use of force had caused confusion and had been inconsistent with the procedures across different divisions.[3] Hence, Springer decided that there would be no use of force training at the annual 2024 in-service training, so Plaintiff would not need to present on the matter.[4] (Doc. 63 at 24–25; Doc. 70 at 38–39.)

Then in March 2024, there was a use of force incident in Defendant's Adult Residential Center. Plaintiff received an email about the incident, but she was not invited to the meeting to review the incident. (Doc. 63 at 25; Doc. 70 at 40.)

Around the same time, there was a DOC scheduled training for a new security software. It is uncontroverted that Plaintiff did not attend the training session because she was not informed that there was training for the new software. (Doc. 63 at 25–26; Doc. 70 at 41.)

On April 11, 2024, Plaintiff filed a retaliation complaint for (a) not being selected as an instructor at the annual in-service meeting, (b) not being invited to the meeting to review the use of force incident at the Adult Residential Center, and (c) not being invited to the scheduled training session for the new security software.[5] Defendant again hired outside counsel to investigate

---

[3] Plaintiff claims that this fact is controverted. However, she failed to put forth evidence demonstrating that it is controverted.
[4] Plaintiff again claims that this fact is controverted. However, she again failed to put forth evidence to show that it is actually controverted.
[5] The factual assertion refers to two incidents. The factual record, by contrast, indicates there were three incidents. Thus, the court lists all three because the parties were not clear as to which two issues or incidents they were referencing in the factual assertion regarding Plaintiff's retaliation complaint.

Plaintiff's complaint. And once again, Plaintiff's claims could not be substantiated.[6] (Doc. 63 at 26; Doc. 70 at 41–42.)

Plaintiff then scheduled a meeting with Sullivan and Clark for July 3, 2024, to discuss how the aforementioned incidents caused her to feel isolated within the department. When Sullivan arrived, he dropped his notepad and sat next to Plaintiff. After a brief discussion, wherein Plaintiff asked questions about what had changed regarding the in-house use of force reviews, Sullivan allegedly yelled at Plaintiff and pointed his finger at her. He allegedly told her that the operations commander could determine how to train his staff. Plaintiff allegedly asked to leave the meeting, but Sullivan would not let her. (Doc. 63 at 26–27; Doc. 70 at 42–43.)

Plaintiff filed a complaint against Sullivan for his conduct in the meeting. Susan Gray, Defendant's highest ranking human resources employee, investigated Plaintiff's complaint. She could not determine if voices were raised during the meeting or if Sullivan pointed his finger at Plaintiff. It is undisputed that after the meeting and investigation, Plaintiff requested to work from home. She currently does so. However, she receives regular merit raises. (Doc. 63 at 27–28, 31; Doc. 70 at 43–45, 49.)[7]

## II.  Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are

---

[6] Again, the court notes that Plaintiff failed to properly controvert Defendant's factual assertion that the claims could not be substantiated.

[7] The numbering of Plaintiff's responses to Defendant's factual assertions is incorrect. As Defendant noted in its reply brief, the numbering is off by one number beginning at fact 173; and beginning at fact 197, it is off by two numbers. However, the court relied primarily on Plaintiff's response brief to review the facts of the case. Therein, she either accepted Defendant's factual assertion as uncontroverted or attempted to controvert them. Thus, despite the incorrect numbering in Plaintiff's response brief, the court was able to assess the substance of the facts asserted by both parties and determine what was controverted and what was not.

"genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Haynes v. Level 3 Commc'ns*, 456 F.3d 1215, 1219 (10th Cir. 2006). The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

In considering a motion for summary judgment, the facts set forth in the motion must refer "with particularity to those portions of the record upon which" the moving party relies. D. Kan. R. 56.1(a). "All material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party." *Id.* To properly dispute a proposed statement of material fact, the opposing party must "refer with particularity to those portions of the record upon which the opposing party relies." D. Kan. R. 56.1(b)(1). Failure to properly controvert a proposed fact that is properly supported will result in a determination that the fact is admitted. *Coleman v. Blue Cross Blue Shield of Kansas, Inc.*, 287 F. App'x 631, 635 (10th Cir. 2008) (finding that the "district court was correct to admit all facts asserted in Blue Cross's summary judgment motion that are not controverted by a readily identifiable portion of the record.") (internal quotation and citation omitted).

**III.    Analysis**

    **A.    Failure to Exhaust Administrate Remedies**

Defendant first attempts to summarily dismiss Plaintiff's Title VII claims on the basis that she failed to exhaust her administrative remedies. It raises two failure-to-exhaust arguments: (1) that Plaintiff failed to raise all of her alleged discrete incidents of discrimination in her Equal Employment Opportunity Commission ("EEOC") charge, and (2) she failed to timely exhaust the administrative remedies for her discrimination and retaliation claim stemming from the change in her job responsibilities.

8

*1. Failure to Raise the Discrete Incidents*

Defendant first argues that Plaintiff's discrimination and retaliation claims cannot be based on discrete incidents she failed to include in her EEOC charge. (Doc. 63 at 34.) Accordingly, Defendant argues that the court should "summarily dismiss[]" any discrimination and retaliation claim based upon the absent incidents. (*Id.* at 36.) The failure to exhaust administrative remedies for a Title VII claim is an affirmative defense that a defendant may raise. *See Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1185 (10th Cir. 2018). However, the standard for determining whether a plaintiff has failed to exhaust her administrative remedies by failing to include a discrete incident in an EEOC charge is less straightforward than Defendant suggests. Indeed, according to the Tenth Circuit: "[t]he ultimate question is whether 'the conduct alleged [in the lawsuit] would fall within the scope of an EEOC investigation which would reasonably grow out of the charges actually made [in the EEOC charge].'" *Smith v. Cheyenne Ret. Invs. L.P.*, 904 F.3d 1159, 1164 (10th Cir. 2018) (citation omitted) (second and third alteration in original). Defendant does not engage with this test or assert that Plaintiff's absent retaliatory and discriminatory acts could not relate to her EEOC charge. Thus, the court denies Defendant's request for summary judgment on this issue.

*2. Failure to Timely Exhaust*

Defendant next asserts a slightly different argument: that Plaintiff failed to *timely* exhaust the administrative remedies for her allegation that Defendant discriminated and retaliated against her by changing her job responsibilities. (Doc. 63 at 36.) Under Title VII, if the employee plaintiff initiates a proceeding with a state or local agency that has authority to grant relief from the alleged unlawful practice, then the plaintiff has three-hundred days to file an EEOC charge regarding that unlawful act.[8] *See* 42 U.S.C. § 2000e-5(e)(1). Plaintiff filed her first EEOC charge on August 14,

---

[8] Neither party disputes that Plaintiff had three-hundred days to file an EEOC charge.

9

2023. Defendant argues that Plaintiff realized Defendant was altering her job responsibilities as early as September 12, 2022, because she could no longer conduct EEO investigations, (Doc. 63 at 16; Doc. 70 at 25), and, therefore, her EEOC charge is untimely as to this claim. However, the facts viewed in a light most favorable to Plaintiff also indicate she was informed by Espinoza on February 14, 2023, that Plaintiff's supervisors planned to change both her job description and her responsibilities. (Doc. 63 at 19; Doc. 70 at 31.) Thus, there is a dispute of material fact regarding when Plaintiff's job responsibilities purportedly changed. As such, Defendant's summary judgment motion is denied as to its argument that Plaintiff failed to timely exhaust her administrative remedies regarding the allegation that Defendants changed her responsibilities.

### B. Defendant's Arguments Pertaining to the Substance of Plaintiff's Title VII Claims

Defendant alternatively moves for summary judgment on substantive grounds. The court considers Defendant's substantive arguments against Plaintiff's claims in this section.

*1. Discrimination*

At summary judgment for a Title VII discrimination claim, a plaintiff may rely on direct or indirect evidence of racial discrimination. When a plaintiff relies on indirect evidence to support a discrimination claim under Title VII, the claim is analyzed under the *McDonnell Douglas* burden shifting framework. *See Amro v. Boeing Co.*, 232 F.3d 790, 796 (10th Cir. 2000); *see Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004). Plaintiff did not offer direct evidence of discrimination.[9]

---

[9] It is difficult to track Plaintiff's reasoning in her response briefing. She appears to rely on the *McDonnell Douglas* burden shifting framework by arguing she can demonstrate Defendant's proffered justifications were pretextual. (Doc. 70 at 83.) She also explicitly asserts that she has direct evidence of retaliation. (*Id.* at 83.) However, Plaintiff has not put forth put forth direct evidence of discrimination. Therefore, the court will utilize the *McDonnell Douglas* standard to evaluate her claims.

Under the *McDonnell Douglas* framework, a plaintiff carries the initial burden of establishing a prima facie case of racial discrimination. *Amro*, 232 F.3d at 796. If the plaintiff establishes a prima facie case, the burden shifts to the defendant "to articulate a legitimate, nondiscriminatory reason for the discharge . . . ." *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1201 (10th Cir. 2006). If a defendant proffers a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to demonstrate that "the stated reason is pretextual." *Id.* "Pretext can be inferred from evidence revealing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's explanation." *Lounds*, 812 F.3d at 1234 (ellipses omitted) (quoting *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 713 (10th Cir. 2014)).

Plaintiff must satisfy the following elements to establish a prima facie case of race discrimination:[10] (1) that Plaintiff suffered an adverse employment action, and (2) the circumstances surrounding the adverse employment action give rise to an inference of discrimination on the basis of her race. *See Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1215 (10th Cir. 2022). Defendant argues that Plaintiff cannot establish these two elements.

In Plaintiff's response briefing, she argues that she suffered two adverse employment actions. The first is the alleged changes in her job responsibilities. The second is when Sullivan allegedly yelled and pointed his finger at her during the July 3, 2024, meeting.[11]

---

[10] Courts often include a third element: that the plaintiff belongs to a protected class. *See, e.g., Daniels*, 701 F.3d at 627. However, that element can be misleading. Title VII does not limit its protections to disfavored groups or classes of people. *See* 42 U.S.C. § 2000e-2(a). Rather, it prohibits certain categories of discrimination, such as discrimination on the basis of race or sex. *See id.*; *see, e.g. Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) ("Title VII's prohibition of discrimination 'because of ... sex' protects men as well as women.")

[11] In the pretrial order, Plaintiff raises 16 distinct actions of discriminatory conduct. (Doc. 54 at 24–27.) However, she only raises two instances in her briefing. Thus, the court will not consider whether the 14 instances of alleged discriminatory acts Plaintiff left out of her summary judgment briefings also constitute adverse employment actions.

"Only acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits will rise to the level of an adverse employment action." *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1222 (10th Cir. 2006) (quotation omitted). Job reassignment may constitute an adverse employment action, and courts have construed it as a fact question. *Davis v. Unified Sch. Dist. No. 512*, 335 F. Supp. 3d 1230, 1237 (D. Kan. 2018), *aff'd*, 792 F. App'x 582 (10th Cir. 2019), and *aff'd*, 799 F. App'x 566 (10th Cir. 2019) (listing Tenth Circuit and District of Kansas cases where courts have concluded it is a fact question whether job reassignment and transfers constitute adverse employment actions). Although Plaintiff does not argue Defendant reassigned her to a different department, she does argue that Defendant radically changed her job responsibilities. (Doc. 70 at 79.) As evidence of the change in her job responsibilities, she claims that after filing the discrimination complaint in March 2023, the number of investigations she regularly conducted decreased from year to year.[12] (*Id.*) Construing the facts in a light favorable to Plaintiff, the court assumes, for the purposes of this summary judgment action, that the change in her job responsibilities constitutes an adverse employment action.[13]

As to element two, Plaintiff failed to put forth an argument as to why these alleged adverse employment actions occurred because of her race. Although the burden on Plaintiff at the prima facie stage is not onerous, she still needs "to raise an inference of discrimination." *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193 (10th Cir. 2000). That analysis is missing from her briefing. Notably, Plaintiff's response is 91 pages. She dedicated 72 pages to facts. She

---

[12] The court is skeptical of Plaintiff's allegations on this point. Based on her briefing, she was assigned fewer investigations in 2022—seemingly before filing her discrimination complaint in March 2023. (Doc. 70 at 79.)
[13] The court need not address whether Sullivan's conduct in the meeting also constitutes an adverse employment action since Plaintiff's claim fails on the second element as explained below.

12

did not request leave from this court to exceed the page limitations set forth in D. Kan. Rule 7.1(d)(2). And although the court understands that Plaintiff needed to respond to Defendant's motion for summary judgment, which contained 29 pages of facts, Plaintiff's additional facts—most of them duplicates of those in Defendant's motion—were over 20 pages. Plaintiff's behemoth 91-page response contained a convoluted recitation of the record but was devoid of the analysis needed to defeat Defendant's motion for summary judgment on her discrimination claim. Therefore, because Plaintiff did not explain why the alleged adverse employment actions were discriminatory on the basis of race, Defendant's motion for summary judgment on Plaintiff's discrimination claim is granted.[14]

   *2. Retaliation*

It is also unlawful under Title VII for employers to retaliate against employees "for opposing practices made unlawful by the statute." *Hansen v. SkyWest Airlines*, 844 F.3d 914, 924 (10th Cir. 2016) (citing 42 U.S.C. § 2000e–3(a)). To prevail, a plaintiff must demonstrate that retaliation "played a part" in defendant's adverse employment action against the plaintiff employee. *Id.* at 925 (internal quotation marks and citation omitted).

Plaintiff can satisfy this standard through two analytical frameworks. The first is the "the direct or 'mixed motives' approach." *Id.* Under this approach, "a plaintiff may offer direct evidence that retaliation played a 'motivating part' in the adverse employment decision." *Id.* (citation omitted). If the plaintiff demonstrates that the defendant employer's adverse action was

---

[14] Additionally, even if Plaintiff had established a prima facie case of discrimination, she would have failed to demonstrate that Defendant's justifications for the adverse employment actions were pretextual. In her response briefing, Plaintiff argues that Defendant conducted sham investigations into her discrimination complaints and cannot proffer legitimate reasons for failing to include her in a training sessions, formally changing her job responsibilities etc. *See* Doc. 70 at 84–89. The court finds it hard to believe Plaintiff's arguments. Defendant hired outside counsel for some of the investigations and offered legitimate reasons for why Plaintiff was not included in training sessions. In summary, after reviewing Plaintiff's pretext arguments, the court finds no evidence of pretext.

motivated by retaliation, then the burden shifts to the defendant employer to show it would have taken the action without a retaliatory motive. *Id.* The second is the indirect/*McDonnell Douglas* framework. *See id.* Under the indirect/*McDonnell Douglas* approach, a plaintiff must first establish a prima facie case of retaliation. *See Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011). If the plaintiff establishes a prima facie case, then the defendant employer "must offer a legitimate, nonretaliatory reason for its decision." *Id.* And lastly, if the employer defendant satisfies its burden of providing a legitimate nonretaliatory reason, then the plaintiff must demonstrate that the reason is pretextual. *See id.*

"At some point, however, the plaintiff must persuade the factfinder either that the evidence shows retaliation was a 'motivating factor' (in which case the evidence is analyzed within the mixed-motive framework) or that it shows the employer's reason is unworthy of belief (in which case it is analyzed within the [indirect/*McDonnell Douglas*] framework)." *Id.* (citation omitted).

Plaintiff is not clear which method she wishes to proceed with. On the one hand, she claims to have direct evidence to establish her retaliation claim. (Doc. 70 at 83.) Indeed, she asserts that her evidence demonstrates that "her supervisors were taking action against her *because she had reported discrimination*." (*Id.*) (emphasis in original). This assertion, however, is within the subsection of her brief that addresses pretext and references the *McDonnell Douglas* framework. (*Id.*) Because she explicitly asserts that she has direct evidence, the court analyzes her retaliation claim under the direct/mixed motive framework.

Within that analytical framework, Plaintiff may rely on direct evidence or circumstantial evidence. *See Twigg*, 659 F.3d at 999–1000. Regardless of the type of evidence, it must be "conduct or statements by persons involved in the decisionmaking process that may be viewed as

directly reflecting the alleged [retaliatory] attitude." *Id.* at 1000 (citation omitted). Plaintiff has not done so here.

Plaintiff's purported direct evidence of a retaliatory motive is Sullivan's inaction. Again, Plaintiff is not clear, but the adverse employment action appears to be the purported changes to her job responsibilities. She argues that her supervisors changed her job responsibilities because she filed discrimination complaints. And her direct evidence of a retaliatory motive is that Sullivan waited to resolve Plaintiff's job issues until after her discrimination claims had been investigated and deemed unsubstantiated. (Doc. 70 at 83.) Plaintiff provides no analysis for why this constitutes direct evidence of retaliation. Rather, it is a conclusory argument, which to Plaintiff, is self-evident. The court isn't so sure. It understands Plaintiff's frustration over Sullivan's decision to resolve Plaintiff's alleged job issues after her discrimination complaints were addressed. That decision does not seem retaliatory, though. After all, Plaintiff's supervisors were in a quandary. If they changed Plaintiff's job responsibilities after she filed a discrimination claim, that decision could certainly be perceived as retaliatory. And if they decided the best course of action would be to maintain the status quo—as they did here—then, as Plaintiff argues, that also constitutes retaliation. In effect, Plaintiff presents to this court a lose-lose scenario for Defendant. And the court finds that argument unavailing. Rather, Defendant's wait-and-see approach was a reasonable solution to handling what clearly had become a difficult situation. By allowing the investigations to conclude, Sullivan guarded against the plausible perception that he retaliated against Plaintiff by changing her job responsibilities mid-investigation. Hence, Plaintiff's alleged direct evidence does not demonstrate retaliatory motive for the purported changes in her job responsibilities.

Therefore, Defendant's motion for summary judgment on Plaintiff's retaliation claim is also granted.[15]

### 3. *Hostile Work Environment*

Lastly, Title VII prohibits a hostile or abusive work environment predicated on a person's race. *See Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957 (10th Cir. 2012). At the summary judgment stage, a plaintiff needs to "show that a rational jury could find that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Young v. City of Idabel*, 721 F. App'x 789, 799 (10th Cir. 2018) (citation omitted) (alterations in original) (third alteration changed to "her"). The harassment must also be based on the plaintiff's race. *See id.*

Plaintiff's hostile work environment claim is based on a single incident: the July 3, 2024, meeting with Sullivan and Clark. (Doc. 70 at 82–83.) During the meeting, after Plaintiff inquired about her job status and responsibilities, Sullivan allegedly yelled at Plaintiff, pointed his finger at her, and did not let her leave the meeting.

First, it does not appear that Sullivan's conduct was motivated by Plaintiff's race. Indeed, Plaintiff fails to assert that the alleged harassment was based on her race. (*Id.* at 81–82.) Moreover, assuming that Sullivan's conduct was based on Plaintiff's race, it was neither sufficiently severe nor persuasive to alter the terms of her employment and create an abusive working environment.

Plaintiff may establish that the harassment altered the terms and conditions of her employment and created a hostile working environment via two independent and equal grounds:

---

[15] If Plaintiff desired to proceed under the indirect/*McDonnell Douglas* framework, she did not attempt to establish a prima facie case of retaliation. Moreover, based on the record, it does not appear she could have established a prima facie case. Hence, the outcome would be the same regardless of the analytical framework she utilized.

(1) the pervasiveness of the harassment, or (2) the severity of the harassment. *See Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1143 (10th Cir. 2008); *see Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998). Additionally, the work environment must be subjectively and objectively hostile. Hence, a court cannot only consider a plaintiff's assessment of the pervasiveness and severity of the harassment. Rather, it must determine if a reasonable employee would deem the intimidation, ridicule, and insult sufficiently severe or pervasive to create a hostile environment. *See Brown v. LaFerry's LP Gas Co.*, 708 F. App'x 518, 520–21 (10th Cir. 2017). (quoting *Lounds*, 812 F.3d at 1222).

When plaintiffs allege a few isolated instances of racial harassment, courts have been reluctant to find they have satisfied the pervasiveness inquiry. For example, in *Brown v. LaFerry's LP Gas Co.*, the plaintiff based his hostile work environment claim on three racially charged comments made over a period of six months. *See id.* at 521. The court concluded three comments within six months fell short of the pervasiveness standard. *Id.* at 522. Likewise, in *Bolden v. PRC Inc.*, 43 F.3d 545 (10th Cir. 1994), the court determined that two overtly racial remarks made by separate employees did not satisfy the pervasive standard either. *Id.* at 551. Furthermore, in *Al-Kazaz v. Unitherm Food Sys.*, Inc., 594 F. App'x 460, 463 (10th Cir. 2014), the court addressed whether three racial comments made in a two-month period constitutes "continuous" harassment that satisfies the pervasive standard. *Id.* at 463. The court concluded it did not despite the instances occurring relatively close together. *See id.* Clearly, Plaintiff's single incident of harassment, devoid of any overtly racist conduct, is not sufficiently pervasive.

Furthermore, because Plaintiff experienced a single instance of alleged enmity, Plaintiff must demonstrate that this isolated incident was "especially egregious or extreme" or "threatening and severe." *See Morris v. City of Colorado Springs*, 666 F.3d 654, 667 (10th Cir. 2012).

17

Under Tenth Circuit precedent, "threatening and severe" and "especially egregious or extreme" isolated incidents typically involve physical assault, *see Brown v. LaFerry's LP Gas Co.*, 708 F. App'x at 522 (citing *Morris*, 666 F.3d at 667) (discussing caselaw that involves what is considered egregious isolated instances because they involve physical touching)), or the cumulation of racist conduct that concludes with a clear threat. *See Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008) (discussing how repeated racial epithets that concluded with a life-size hangman's noose directed toward African American coworker creates a hostile environment). In cases where courts have found physical assault to be egregious and extreme, the conduct typically goes beyond a minor battery tort claim. Instead, the physical touching is often sexual in nature. *See e.g., Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1242–43 (10th Cir. 2001) (Plaintiff was digitally raped and physically assaulted by a patient); *see Lockard v. Pizza Hut*, Inc., 162 F.3d 1062, 1072 (10th Cir. 1998) (two male customers grabbed a female plaintiff's hair and breast, which he put into his mouth). Again, Plaintiff's single incident is clearly not sufficiently egregious. After all, there was no physical touching or overtly racist conduct that involved a clear threat.

Thus, Defendant's motion for summary judgment on Plaintiff's hostile work environment claim is also granted.

### IV. Conclusion

THEREFORE, Defendant's motion for summary judgment is GRANTED. Because the court granted summary judgment to Defendant based its substantive arguments against Plaintiff's claims, it does not address Defendant's *Faragher/Burlington* affirmative defense.

IT IS SO ORDERED. Dated this 31st day of July, 2025.

                                      s/ John W. Broomes  
                                      JOHN W. BROOMES  
                                      UNITED STATES DISTRICT JUDGE